IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**GRETA D. HEAVINGTON,**

    **Plaintiff**

vs.                                                                                                            Civil No. 05cv0013RLP

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Greta D. Heavington ("Plaintiff" herein) filed an application for Disability Income benefits on June 4, 1998. (Tr. 254). She alleges that she became disabled as of December 2, 1996. (Tr. 645). She was last insured for disability income benefits as of December 31, 1996. (Tr. 584). Her application was denied at the first and second levels of administrative review. (Tr. 235, 236). A hearing was conducted by an administrative law judge on March 28, 2000, and a decision denying Plaintiff's claim was entered on July 24, 2000. (Tr. 39-54). The Appeals Council affirmed the ALJ's decision. (Tr. 90). Plaintiff filed suit in this court to overturn the Commissioner's denial of her claim. On June 5, 2003, this matter was remanded to Commissioner for additional proceedings.[1] (Tr. 115). A second administrative hearing was conducted on November 20, 2003. Plaintiff's claim was again denied in a decision dated March 26, 2004. (Tr. 19-28). The Appeals Council declined review. (Tr. 9). The matter now before the court is Plaintiff's motion to reverse or remand the administrative

---

[1] The parties filed an "Agreed Motion to Reverse and Remand" pursuant to sentence four of 42 U.S.C. §405(g). The Motion stated that on remand, the ALJ would: Reassess Plaintiff's mental impairment, specifying any work related limitations that resulted therefrom; give further consideration to the opinion of Jonathon Burg, M.D., Plaintiff's treating physician, providing specific, legitimate reasons if that opinion was rejected; reevaluate Plaintiff's credibility in accordance with 20 C.F.R. §404.1529 and S.S.R. 96-7p; and obtain vocational testimony. (Tr. 112).

denial of her claim.

**II      Standard of Review.**

The court reviews the decision of the Commissioner to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.[2] The Supreme Court has held that "substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[3]  In reviewing the record to determine whether substantial evidence supports the Commissioner's decision, the court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner.[4]  Evidence is not considered substantial "if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion."[5]  The court also reviews the decision of the Commissioner to determine whether the Commissioner applied the correct legal standards.[6]

**III.    Summary of Relevant Facts**

Plaintiff was born on April 20, 1957.  She has a GED and prior work experience as a checker, sales clerk and stocker at Walmart.  Plaintiff sustained a job-related injured her right shoulder in April 1992.  The shoulder injury, originally diagnosed as bursitis or shoulder strain, developed into

---

[2] Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1028 (10th Cir.1994).

[3] Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

[4] Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir.2000) (citing Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir.1991)).

[5] Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir.1985) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983)).

[6] Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir.1994); Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir.1994).

impingement syndrome, tendinitis of the rotator system and frozen shoulder syndrome. (Tr. 308, 305, 309-310, 429, 317, 373-375).

Plaintiff was off work collecting workers' compensation benefits from June 1993 until mid 1995. During that time she had surgery in an attempt to lessen pain complaints and increase severely limited range of motion of the shoulder.[7] On June 5, 1995, Anthony Pachelli, M.D., her treating surgeon, stated that although she continued to have limited range of motion and pain, she had reached maximum medical improvement ("MMI")[8]. He assigned an impairment rating of 20% to the right upper extremity based on weakness and loss of motion in the right arm, and suggested that a functional capacities evaluation be obtained. (Tr. 402). This evaluation was performed on June 13, 1995 at Sun Country Physical Therapy Associates. Following this evaluation Plaintiff was placed in a light work category, with additional limitations: Her ability to push and pull was limited to her left hand/arm only, her ability to crawl was limited to 5% of a work day, and her ability to balance was limited to occasional (up to 2½ hours). (Tr. 396). The evaluation form indicates a further limitation in ability to reach above shoulder level, but the remainder of the report does not describe that limitation. (Tr. 395-401). Dr. Pachelli had previously stated that Plaintiff was to perform no repetitive overhead lifting, and would have a weight limitation for below-shoulder lifting. (Tr. 407).

---

[7] On June 16, 1993, Joseph Allegretto M.D.. performed an examination under anesthesia, right shoulder arthroscopy and open acromionectomy and bursectomy. (Tr. 317-318). As of November 1993, and again in August 1994, Plaintiff continued to suffer from chronic capsulitis of the shoulder with signs of residual scarring, mobility stiffness and chronic pain. (Tr. 373-375). On August 30, 1994, Anthony Pachelli, M.D. performed a manipulation under anesthesia to release adhesive capsulitis. (Tr. 417). This resulted in improved range of motion and some decrease in pain. (Tr. 407-408)

[8] "Date of maximum medical improvement" is a term used in the New Mexico Workers' Compensation Act, and means "the date after which further recovery from or lasting improvement to an injury can not longer be reasonably anticipated based upon reasonable medical probability as determined by a health care provider . . ." N.M.S.A. §52-1-42.1 (2004).

Plaintiff returned to work, but reinjured her right shoulder on November 21, 1996, while stocking shelves. (Tr. 580, 652). She was evaluated on November 26, 1996, by Barry Comer, M.D., an orthopedic surgeon, who noted decreased strength and range of motion of the right arm/shoulder, with demonstrable tenderness and complaints of severe pain. (Tr. 582). He diagnosed acute strain of the right rotator cuff with prior history of impingement syndrome, and prescribed medication and physical therapy. Despite physical therapy, Plaintiff continued to have severely limited range of motion and strength. (Tr. 576).

Plaintiff was referred to Jonathon Burg, M.D., a specialist in physical medicine and rehabilitation. In his report dated January 14, 1997, Dr. Burg reviewed and provided an extensive discussion of Plaintiff's medical history, noted her complaints of constant right shoulder pain aggravated by any activity, and recorded physical examination findings including range of motion deficits, guarding, and weakness of the rotator cuff musculature. He diagnosed recurrent impingement syndrome vs. frozen shoulder and chronic pain, and stated that Plaintiff should not perform any job that required repetitive lifting of even light objects with the right arm, and that she was completely disabled from any job that required use of the right hand for more than answering the telephone or shuffling papers. Dr. Burg also treated Plaintiff with trigger point and subacromial injections, and referred her to other specialists for additional work up. (Tr. 606-615).

Plaintiff returned to Dr. Burg on March 31, 1997. On physical examination he noted marked range of motion deficits and "tremendous trigger point activity throughout the neck and shoulder girdle." (Tr. 603). Dr. Burg stated that Plaintiff had reached maximum medical improvement from her November 1996 injury, and that the impairment rating of her right upper extremity remained at 20 per cent. He further stated that if she returned to her prior job she would suffer repeated injuries

due to her impaired range of motion and arm weakness, and that she was developing symptoms of overuse of her left arm and shoulder. In terms of work that she was capable of performing, he stated:

> . . . I think that her current restrictions have to be altered. I believe she can work but these restrictions would be quite extensive and would probably make her unusable at Walmart for even jobs such as being a greeter since she cannot manage the shopping carts which I believe is one of the jobs of greeters, i.e., to collect the shopping carts.
>
> I continue to suggest that she look for work elsewhere, perhaps as a clerk at a retail store, which will not involve heavy use of the right arm. With regards to her specific restrictions, I have suggested that there be no lifting with the right arm and lifting only ten pounds with the left arm with no forward bending; kneeling; no reaching above chest high; and no repetitive movements with the right arm. These would be her permanent restrictions.

(Tr. 604).

Plaintiff's worker's compensation carrier accepted the restrictions imposed by Dr. Burg. It appears that he advised the carrier in April that Plaintiff was unable to perform two jobs that were available at the employer's business. [9] (Tr. 618-619).

In January 1999 a non-examining agency physician assessed Plaintiff's residual functional capacity following a review of her medical records. Stating "limited (range of motion) could be expected to impose significant functional limitation for the right shoulder," the physician determined that Plaintiff had the RFC for light work[10] reduced by an unspecified limitation in the ability to push or pull with the right hand, and all postures (e.g., kneeling, balancing, crawling) limited to occasional

---

[9] A note prepared by case manager Susan Mueller states that on April 11, 1997, Dr. Burg indicated that Plaintiff would not be able to perform the jobs of entrance door greeter or exit greeter in the garden center at Walmart.

[10] Light work is defined a work which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and requires a good deal of walking, standing, or pushing and pulling when sitting is involved. Social Security Ruling 83-10; 20 C.F.R. §404.1567(b).

only. (Tr. 586)

Plaintiff continued to be treated by Dr. Burg through August 2000, receiving regular trigger point and subacromial bursa injections, and prescriptions for pain and sleep medication. (Tr. 598-601, 593-597, 624-630). On August 3, 2000, Dr. Burg stated that Plaintiff had continued impingement of the shoulder, which was "essentially a useless shoulder, quite tender and very little range of motion . . . The patient has a significant shoulder injury . . .(and) has had very poor outcome from (three prior) surgeries. She also has significant myofacial pain in her upper back and neck, which is typical in these patients." (Tr. 169).

On January 5, 2000, Plaintiff was evaluated for depression and anxiety by Patricia Campbell, RN, MA, following a domestic violence incident and separation from her husband. (Tr. 129-137). Plaintiff was started on anti-depressant medication. She saw Ms. Campbell on January 17th, 24th and February 1st. Their discussions centered on financial problems and domestic issues. (Tr. 138-139, 135). At the request of Plaintiff's attorney, Ms. Campbell prepared a letter dated March 25, 2000, in which she stated that Plaintiff was at that time unable to sustain full time employment due to post-traumatic stress disorder and depression.

Plaintiff was seen at the Guidance Center of Lea County on September 1, 2000, complaining of overwhelming depression and anxiety. (Tr. 170-178). She gave no history of psychiatric problems.[11] (Tr. 176). Plaintiff had been in a motor vehicle accident five months earlier (Tr. 187), her domestic difficulties had continued (Tr. 180-181, 186), and she was still being treated for chronic shoulder pain. (Tr. 186, 169). Based on history and mental status exam, Plaintiff was diagnosed

---

[11]Plaintiff received psychological counseling in 1993 after her original shoulder injury (Tr. 314-316, 312), and again in 1994. (Tr. 356, 649-650). An MMPI evaluation in May 1994 indicated that she had a hysteroid personality, was prone to marked somatization during periods of stress, and suffered mild depression with significant focus on somatic functioning. (Tr. 354-355). Her last recorded visit with a psychologist was on May 18, 1994 (Tr. 352), two and a half years prior to her alleged date of onset of disability.

with Dependent Personality Disorder and Post Traumatic Stress Disorder. Her mental status examination described her as alert, open and accessible, with normal and adequate speech, appropriate affect, normal flow and content of thought, normal memory and average intelligence. She was also described as tremulous, with an anxious and fearful mood.

## IV.     The ALJ's Decision

The ALJ determined that Plaintiff was not under a disability prior to December 31, 1996, the date she was last insured. In reaching this conclusion he found that Plaintiff was not working (step 1); that she suffered from severe impairments including right shoulder dystonia, chronic right shoulder pain, chronic suprascapular neuropathy, right shoulder adhesive capsulitis, post traumatic stress disorder, anxiety and depression (step 2); that her impairment did not meet or equal a listed impairment (step 3); that her testimony regarding her functional limitations was not consistent with the record as a whole; that she retained the residual functional capacity for a limited range of light work[12]; that she could not perform her past work (step 4), and that she retained the residual functional capacity to perform a significant number of jobs available in the national economy (step 5).

## V.      Issues Raised

Plaintiff contends that the ALJ erred by:

(1)     Improperly disregarding Plaintiff's credibility.

(2)     Improperly disregarding the opinion of treating mental health counselor Patricia Campbell, and

---

[12] The ALJ determined that Plaintiff had the ability to sit, stand and/or walk six hours in an eight hour workday, lift and/or carry 20 pounds occasionally and 10 pounds frequently, occasionally bend stoop, crawl and climb, never balance, work at unprotected heights, climb ladders, ropes or scaffold; that she had limited ability to perform overhead reaching with right upper extremity, and that she could perform routine, repetitive work. (Tr. 26, 27).

(3)     Improperly disregarding the opinion of treating physician Jonathon Burg, M.D.

**VI.    Discussio**n

1.    Credibility

Credibility is peculiarly the province of the ALJ.  The ALJ's "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings,"and he must "articulate specific reasons for questioning a claimant's credibility" where subjective pain testimony is critical.[13]  Failure to make credibility findings regarding critical testimony fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support  his conclusion that claimant is not under a disability."[14]

The ALJ listed the factors he considered in assessing Plaintiff's credibility.[15]  However, he did not state which he found not to be credible, nor did he cite to specific evidence that contradicted Plaintiff's testimony.   I will examine each factor listed by the ALJ.

A.    *Plaintiff testified that she had problems being a greeter at Wal-Mart in March 1997 because she had to do duties such as pushing carts, cleaning, and lifting packages for customers.  She testified that she has had constant pain in her upper body, some days worse than others.*  (Tr. 24).

Plaintiff testified that she tried work as a greeter at Walmart in March 1997, but had problems performing that job because it involved  pushing, pulling, gathering and cleaning shopping carts, handling boxes (returns and exchanges), and that she couldn't perform those activities because they caused headaches, muscles spasm and pain in her shoulder and neck.  (Tr. 655-656).  There is no evidence to the contrary, and in fact evidence from Plaintiff's worker's compensation carrier and Dr.

---

[13]Kepler v. Chater, 68 F.3d 387, 391 (10th Cir.1995) (internal quotations omitted).

[14]Id. (internal quotations omitted).

[15]An ALJ's decision must be evaluated based solely on the reasons stated in that decision. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962).

Burg support Plaintiff's testimony. (Tr. 618-619, 604).

> B.  *Plaintiff testified that sometimes her left arm and shoulder bothered her because she had to use her left arm and shoulder so much. (Tr. 24).*

Plaintiff testified that she began having problems with her left arm and shoulder because of overuse. (Tr. 660). Plaintiff's medical care was obtained through her workers' compensation carrier. Her left arm was rarely evaluated since her work injury involved her right shoulder. Plaintiff did complain to her physical therapist shortly after her reinjury that her left shoulder felt tired and painful due to excessive use of her left arm. (Tr. 580). Dr. Burg also stated that she had been overusing her left arm and "is no doubt going to develop, and in fact already has started having complaints of left shoulder pain." (Tr. 604).

> C.  *Plaintiff testified that she merely cannot lift anything heavy and that she has a poor grip and tends to drop things. She testified that she could not lift a sack of potatoes weighing five to ten pounds. (Tr. 24)*

Plaintiff testified that at the end of 1996 and in 1997 she would drop anything heavy that she tried to lift *with her right hand* because of problems with grip, describing a 5-10 pound sack of potatoes as something heavy. (Tr. 662-663). The ALJ apparently used the first statement, that she tended to drop heavy things, to support his finding that Plaintiff could perform lifting in the less than heavy range. He used the second statement, that she could not lift over 5-10 pounds, to discredit her testimony since her functional capacity evaluation in 1996 indicated an ability to lift in excess of 40 pounds with the left hand.

Plaintiff's testimony is not inconsistent with the medical record. Plaintiff's testimony described limitations she had using her *right* arm. All doctors who have evaluated her found that her ability to lift with her right arm was limited. In 1992 Dr. Pachelli limited her use of her right arm for below shoulder lifting to 10 pounds. (Tr. 447). In 1995 he indicated that her work status should be

9

determined by a functional capacity assessment (Tr. 402). That assessment described right arm lifting and carrying tolerances consistent with Plaintiff's testimony. The evaluation also indicated that pushing/pulling actions could be performed only with Plaintiff's left hand/arm. (Tr. 395-398). Dr. Burg, after she reinjured her right shoulder, indicated that she should perform no lifting with her right arm. (Tr. 604).

> D. *Plaintiff had $8,612.12 in earnings in 1996, which reflected substantial gainful activity for that year.* (Tr. 24).

Plaintiff's income, prior to reinjury of her right shoulder and the onset of her date of disability, does not cast any doubt on her credibility.

> E. *Plaintiff testified that she had to lie down six or seven times per day in 1996. There is no evidence that this was related to any of her impairments.* (Tr. 24).

Plaintiff testified that in 1996-1997, she had to lie on ice packs and use Tiger Balm about 6-7 times a day and that the pain eased up only after about an hour of doing so. (Tr. 660-661). There is no medical record indicating that Plaintiff used ice or topical ointments for relief of pain during this time frame.[16]

> F. *Plaintiff indicated that she is able to button the front buttons of her clothes, pick up a pencil from the table, write a letter, pick up coins from the dresser without scooting them to the edge, tie her shoes, and zip her clothing. She stated that she was able to do a little of all household chores but that her son does the majority of the household duties, but no longer was able to engage in recreational activities such as hunting, fishing, hiking, and playing musical instruments. She is able to drive a car when she has to.* (Tr. 24-25).

It is difficult to know what significance the ALJ attributed to these statements by Plaintiff. The court is at a loss as to how the ability to perform these activities is inconsistent with a claim of

---

[16]Medical records indicate that ice was recommended to treat muscle spasm and tightness in 2001. (Tr. 167, 146, 141).

10

disability. The ALJ pointed to no other activities which are inconsistent with plaintiff's claimed limitations. The court's review of the records does not disclose any such evidence.[17] What is clear is that "the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain."[18]

The credibility evaluation performed by the ALJ is seriously flawed. He misrepresented or misread the medical record in several instances, and failed to support purported instances of inconsistency with substantial evidence. Accordingly I find that the ALJ failed to apply correct legal principles in assessing Plaintiff's credibility, and that his assessment is not supported by substantial evidence.

2.   Dr. Burg.

The ALJ rejected the opinions of Dr. Burg regarding Plaintiff's functional limitations in determining her residual functional capacity on the date she was last insured for disability insurance benefits. Dr. Burg is a treating physician.[19] As such, his opinion regarding the functional implications of Plaintiff's right arm impairment is entitled to controlling weight if " well supported by clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence in the record."[20] The ALJ must give specific, legitimate reasons for rejecting the opinion of a treating physician.[21] The ALJ "may reject a treating physician's opinion outright only on the basis of

---

[17] See Simmonds v. Massanari, 160 F.Supp.2d 1235, 1243 (D. Kan. 2001).

[18] Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993).

[19] Defendant's argument that Dr. Burg is not a treating physician is disingenuous. The record clearly establishes that he had a long standing treatment relationship with Plaintiff.

[20] Castellano v. Secretary of Health and Human Services, 26 F.3d 1027,1029 (10th Cir. 1994), see §20 C.F.R. 404.1527(d) (2).

[21] Miller v. Chater, 99 F.3d 972, 976 (10th Cir.1996).

contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."[22]

Dr. Burg's records contain January and March 1997 reports setting forth his opinions as to Plaintiff's functional limitations. I will not discuss the opinion in the January report, or the ALJ"s reason for rejecting it, since it is clear that the March report sets forth Dr. Burg's considered opinion after additional evaluation of Plaintiff's condition.

The ALJ rejected the functional limitations assigned by Dr. Burg in March 1997, finding that the limitations were inconsistent his statement that Plaintiff could work as a retail store clerk which would not involve heavy use of her harm, and further inconsistent with a 20% impairment rating that had been assigned for workers' compensation purposes.

I find that the ALJ did not apply correct legal principles in assessing Dr. Burg's opinion. Dr. Burg stated that Plaintiff could "perhaps" work as a retail store clerk. (Tr. 604). This statement can not be isolated from the specific functional limitations he then set out in the every next sentence of his report.[23]

Turning to Plaintiff's 20% impairment rating, such ratings are mandated in workers' compensation actions in New Mexico and must be based on the AMA guidelines. They do not, however, determine whether an individual is or is not disabled. [24] The ALJ provided no rationale for

---

[22]McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir.2002) (quotation omitted) (emphasis in original).

[23]See Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir.2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

[24]In Madrid vs. St. Joseph Hospital, 122 N.M. 524, 529,  928 P.2d 250, 255 (1996),  the New Mexico Supreme Court stated that when a worker is unable to return to work at a rate of pay equal to or higher than the pre-injury wages, the workers' compensation judge applies a statutory formula in order to determine the appropriate level of workers' compensation benefits.  §52-1-26.1. That formula incorporates the worker's

12

his conclusion that the 20% impairment rating was inconsistent with Dr. Burg's opinion regarding her functional limitations.

I find that the ALJ failed to applied correct legal principles in assessing the opinion of Dr. Burg.

    3.    Nurse Campbell.

The ALJ rejected the opinion of Nurse Campbell that Plaintiff was incapacitated by severe post traumatic stress disorder and depression, finding that the opinion was brief, conclusory and not supported by objective medical findings, and because Nurse Campbell was not an acceptable medical source as defined in 20 C.F.R. §404.1513.

Because this matter must be remanded for other errors, I do not find it necessary to discuss the ALJ's rejection of this opinion.[25]

VII.    Conclusion.

The errors in evaluation of Plaintiff's credibility and the opinion of Dr. Burg regarding Plaintiff's functional limitations, resulted in an assessment of residual functional capacity which is not supported by substantial evidence, and the posing of a hypothetical question to the vocational expert that was not based on substantial evidence. Therefore, the determination of the Commissioner that Plaintiff is not disabled must be reversed.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand (Docket No.8) is granted.  This matter is remanded to the Commissioner of Social Security for additional proceedings.  The Commissioner is instructed reassess Plaintiff's credibility; give controlling weight

---

percentage impairment rating, age, education, and residual physical capacity  in order to arrive at a disability rating, which determines the level of benefits available.  N.M.S.A. § 52-1-26(C).

    [25]I note, as the ALJ failed to do, that Nurse Campbell's opinion described Plaintiff's mental condition long after the expiration of her insured status.

to the opinions of Dr. Burg regarding Plaintiff's functional limitations, and obtain testimony from a vocational expert which incorporates Dr. Burg's findings regarding Plaintiff's functional limitations.

                                              RICHARD L. PUGLISI
                                              United States Magistrate Judge
                                                 (sitting by designation)